# United States Court of Appeals for the Federal Circuit

---

**GSS HOLDINGS (LIBERTY) INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2021-2353

---

Appeal from the United States Court of Federal Claims in No. 1:19-cv-00728-EGB, Senior Judge Eric G. Bruggink.

---

Decided: September 21, 2023

---

ANDREW JOHN PINCUS, Mayer Brown LLP, Washington, DC, argued for plaintiff-appellant. Also represented by SAMANTHA BEAR, TIMOTHY S. BISHOP, Chicago, IL; GEOFFREY M. COLLINS, BRIAN WRIGHT KITTLE, New York, NY.

SHERRA TINYI WONG, Tax Division, Appellate Section, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by JACOB EARL CHRISTENSEN, DAVID A. HUBBERT.

---

Before NEWMAN, REYNA, and CUNNINGHAM, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* CUNNINGHAM.

Dissenting opinion filed by *Circuit Judge* NEWMAN.

CUNNINGHAM, *Circuit Judge.*

GSS Holdings (Liberty) Inc. ("GSS") appeals from a decision of the United States Court of Federal Claims ("Claims Court") granting summary judgment in favor of the government and denying summary judgment in favor of GSS with respect to GSS's 2011 deduction claim for a federal tax refund or credit for the tax year ending on December 31, 2009. *GSS Holdings (Liberty) Inc. v. United States*, 154 Fed. Cl. 481 (2021) ("*Decision*"). Because we conclude that the Claims Court erred by applying an incorrect legal standard to reach its decision, we vacate the judgment and remand for a determination under the correct legal standard.

## I. BACKGROUND

GSS serves as the managing member and owner of Liberty Street Funding LLC ("Liberty Street").[1] *See* J.A. 17 ¶ 9; J.A. 1423, 1431. In September 2006, Liberty Street purchased a note issued by Aaardvark IV Funding Limited (the "Aaardvark Note") and entered into a liquidity asset purchase agreement ("LAPA") for the Aaardvark Note (the "Aaardvark LAPA"). *See* J.A. 619–52, 1046–77; *Decision* at 484 n.6. The Bank of Nova Scotia ("BNS") was Liberty Street's counterparty for the Aaardvark LAPA, requiring BNS to purchase the Aaardvark Note at par value if

---

[1]    Liberty Street Funding LLC's predecessor was Liberty Street Funding Corp. *See* J.A. 17 ¶ 10; J.A. 1431. In this opinion, we refer to both entities as Liberty Street.

Liberty Street exercised the LAPA. *See* J.A. 619, 626–29, 1111; *Decision* at 483–84 & n.5.

In April 2007, in anticipation of the adoption of certain banking regulations, Liberty Street entered into a note purchase agreement with an unrelated investor, Reconnaissance Investors, LLC ("Reconnaissance"). *See* J.A. 19–20 ¶¶ 19–23; J.A. 739–40, 749–61, 779–81, 790–92; *Decision* at 484–85 & nn.11–14. Under that note purchase agreement, Liberty Street issued an Expected Loss Note (the "First Loss Note") to Reconnaissance.[2] *See* J.A. 19–20 ¶ 23; J.A. 253, 739–40, 804–06. Reconnaissance funded an account (the "First Loss Note Account") in order to cover some of the risk of Liberty Street's assets. *See* J.A. 137, 753, 808–12; *Decision* at 485 n.14. In other words, Reconnaissance's money paid into the First Loss Note Account would be used to compensate BNS in the event of a loss in value of Liberty Street's assets. *See* J.A. 20–21 ¶¶ 25–26, 29; J.A. 808, 810–11.

On December 29, 2011, BNS's subsidiary, Scotiabank (Ireland) Limited ("Scotiabank Ireland"), purchased the First Loss Note from Reconnaissance and succeeded Reconnaissance's rights and obligations. *See* J.A. 148, 1003–09, 1011–35; *see also* J.A. 520–26; *Decision* at 483–85. For tax purposes, Scotiabank Ireland's investment in the First Loss Note was treated as a partnership interest in Liberty Street. *See* J.A. 1026; *Decision* at 484–86. On December 30, 2011, Liberty Street exercised the Aaardvark LAPA, and BNS purchased the Aaardvark Note at a loss. *See Decision* at 483–85; J.A. 1090. BNS certified this loss to the First Loss Note holder, Scotiabank Ireland, causing Liberty Street to pay $24 million to BNS from the First Loss

---

[2] Reconnaissance Investors, LLC later assigned the First Loss Note to Reconnaissance Investors IV, LLC. *See* J.A. 21 ¶ 32; J.A. 918. In this opinion, we refer to both entities as Reconnaissance.

Note Account.  *See* J.A. 1105; *Decision* at 484–85.  Liberty Street's loss was allocated to GSS.[3]  *See Decision* at 485; J.A. 1109–10.

In June 2013, GSS filed an Amended U.S. Corporation Income Tax Return with the Internal Revenue Service ("IRS") for the tax year ending December 2009 and requested to carry back the allocated 2011 loss to deduct the loss from its 2009 tax year.  *See* 26 U.S.C. § 165; J.A. 30–62; *Decision* at 485.  In December 2014, the IRS disallowed the claimed loss deduction under 26 U.S.C. § 707(b)(1).  *See* J.A. 1108–15; *Decision* at 483, 486.  With respect to the claimed loss deduction, the IRS focused on Liberty Street's Aaardvark Note sale to BNS and the $24 million payment to BNS to conclude that these transactions should be treated as a single transaction under the step transaction doctrine.  *See* J.A. 1115; *Decision* at 483, 486, 490.  Accordingly, the IRS disallowed the deduction under 26 U.S.C. § 707(b)(1) as a loss from the sale of property (the Aaardvark Note) between a partnership (Liberty Street) and a person owning more than fifty percent of the capital interest in the partnership (Scotiabank Ireland, the subsidiary of BNS).  *See* J.A. 1112–13, 1115; *Decision* at 483, 490.  GSS filed a Protest, but the IRS Appeals Office issued a notice of disallowance in June 2017.  *See* J.A. 71–72, 1171–72; *Decision* at 486.

In May 2019, GSS filed a complaint in the Claims Court seeking a federal tax refund or credit for the 2009 tax year concerning its disallowed deduction under 26 U.S.C. § 165.  *See* J.A. 16–29; *Decision* at 486.  Following discovery, GSS moved for summary judgment, and the

---

[3]    Because Liberty Street received approximately $1.45 million in insurance proceeds from this event, Liberty Street's claimed loss deduction for tax purposes was $22,549,612.  J.A. 24 ¶¶ 47, 50; J.A. 1110–11, 1438–39; *Decision* at 484–85.

government cross-moved for summary judgment. *See Decision* at 483, 486. In July 2021, the Claims Court denied GSS's motion, granted the government's cross-motion, and entered final judgment in favor of the government. *See id.* at 483, 490; J.A. 1.

GSS now appeals. We have jurisdiction to hear this appeal under 28 U.S.C. § 1295(a)(3).

## II. STANDARD OF REVIEW

We review de novo a grant and denial of summary judgment by the Claims Court. *Kimble v. United States*, 991 F.3d 1238, 1242 (Fed. Cir.) (citation omitted), *cert. denied*, 142 S. Ct. 98 (2021). Whether the Claims Court applied the correct legal standard is a question of law. *See McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1014 (Fed. Cir. 2003) (citation omitted). We also review questions of law de novo. *See Golden v. United States*, 955 F.3d 981, 986 (Fed. Cir. 2020) (citation omitted).

## III. DISCUSSION

On appeal, GSS raises two independent alleged errors: (i) the Claims Court applied an erroneous hybrid legal standard that conflated the step transaction doctrine and the economic substance doctrine, and (ii) the Claims Court violated the principle of party presentation. *See* Appellant's Br. 35–38, 42–44; *see also* Oral Arg. at 9:16–35, https://oralarguments.cafc.uscourts.gov/default.aspx?fl=21-2353_01132023.mp3 (GSS acknowledging it raises both errors); Oral Arg. at 22:27–45 (the government acknowledging the same). We agree with GSS that the Claims Court erred by applying a hybrid legal standard that improperly conflated the step transaction doctrine and the economic substance doctrine. Because we vacate and remand on that basis, we do not reach GSS's second challenge.

This court has recognized that various doctrines have been judicially developed to enforce the purposes of the tax

code—two of which are the step transaction doctrine and the economic substance doctrine. *See Falconwood Corp. v. United States*, 422 F.3d 1339, 1349 (Fed. Cir. 2005) ("The step transaction doctrine is a judicial manifestation of the more general tax law ideal that effect should be given to the substance, rather than the form, of a transaction[.]" (citations omitted));[4] *Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1353 (Fed. Cir. 2006) ("The economic substance doctrine represents a judicial effort to enforce the statutory purpose of the tax code."). Under the end result test of the step transaction doctrine, courts first determine whether the doctrine applies by examining the series of transactions at issue and analyzing whether the "separate transactions were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result."[5] *Falconwood*, 422 F.3d at 1349 (internal quotation marks and citation omitted); *see also True v. United States*, 190 F.3d 1165, 1174–75 (10th Cir. 1999) ("[T]he step transaction doctrine . . . operate[s] [by] collaps[ing] the individual steps of a complex transaction into a single integrated transaction for tax purposes." (citation omitted)). Separately, under the economic substance doctrine, courts focus solely on "the transaction . . . that gave rise to the alleged tax benefit" and analyze whether that specific transaction had "economic substance." *Coltec*, 454 F.3d at 1355–57.

---

[4]    Our recognition of the relationship between the step transaction doctrine and substance over form principle dispels the dissent's concern that we "reject[]" the substance over form principle. *See* Dissent at 3–4.

[5]    This inquiry is known as the "end result test," one of the "three basic tests that define the criteria upon which application of the step transaction doctrine applies[.]" *Falconwood*, 422 F.3d at 1349. The parties agree that the two other tests are not at issue. *See* J.A. 1407, 1483.

GSS argues that the Claims Court "improperly used the economic substance doctrine's rule looking only to the step that creates the tax benefit in analyzing the step transaction doctrine." Appellant's Br. 43. We agree and find that the Claims Court applied a hybrid legal standard conflating the step transaction doctrine and the economic substance doctrine, which the government agrees "are two separate doctrines." Oral Arg. at 13:26–28. The Claims Court started its analysis by correctly recognizing that the parties advocated for an analysis under the step transaction doctrine. *See Decision* at 486 ("GSS asks the court to find that the step transaction doctrine was inappropriately applied here . . . "); *id.* at 487 (explaining that the government advocated for "an application of the 'step transaction doctrine'"). The Claims Court also correctly recognized that the end result test, which determines whether the step transaction doctrine applies, involves assessing the "[i]ntent of the taxpayer" "from the *outset*." *Id.* at 488–89 (first citing *Falconwood*, 422 F.3d at 1349; and then citing *True*, 190 F.3d at 1175) (emphasis added). However, rather than proceeding to assess intent from the outset as required under the end result test of the step transaction doctrine, the Claims Court instead focused on the transaction giving rise to the alleged tax benefit as taught by the economic substance doctrine.

Citing this court's *Coltec* decision—which analyzed the economic substance doctrine—the Claims Court incorrectly stated that "[t]he transaction . . . to be analyzed" here was "the one that gave rise to the alleged tax benefit." *Id.* at 488 (quoting *Coltec*, 454 F.3d at 1356); *see also id.* ("[W]e find the *Coltec* analysis particularly apposite here . . ."). Applying this hybrid legal standard, the Claims Court concluded that "[t]he relevant event" to determine intent "[wa]s the payment out of [the First Loss Note Account] to BNS at the end of 2011." *Id.* at 489. Examining this 2011 timeframe, the Claims Court held that "[t]here [wa]s no question that the 'taxpayer intended to reach a particular

result' here, namely, to use the First Loss Note payment to offset some of the LAPA counterparty's losses." *Id.* (quoting *True*, 190 F.3d at 1175). Accordingly, the Claims Court treated these two transactions as a single transaction. *Id.* Specifically, the Claims Court found that GSS's claimed loss was properly disallowed under 26 U.S.C. § 707(b)(1), denied GSS's motion for summary judgment, and granted the government's cross-motion for summary judgment. *Id.* at 490.

We conclude that the Claims Court applied a hybrid legal standard to reach its decision. The government conceded as much during oral argument, stating that "about the hybrid test . . . the lower court did borrow from *Coltec*, which is an economic substance case [and] borrowed from that case to identify the correct transaction" on which to place its focus. Oral Arg. at 21:52–22:08; *see also* Appellee's Br. 53–54 (the government admitting same); Oral Arg. at 22:50–23:10 (the government agreeing that the Claims Court "discussed both" the step transaction and economic substance doctrines); Oral Arg. at 20:35–21:11 (Q: "If we were to find that the [Claims] Court . . . started . . . the step transaction analysis not at the beginning [*i.e.*, outset], . . . would you concede that the [Claims] Court erred?" Government: " . . . Yes, because the instruction from all the cases that the parties have cited is that you have to start the analysis from the beginning [*i.e.*, outset].").  This hybrid application was legal error. *See Smith v. Gen. Servs. Admin.*, 930 F.3d 1359, 1361–62 (Fed. Cir. 2019) (holding that the Merit Systems Protection Board legally erred by "conflat[ing] two distinct inquiries"); *see also Bryant v. Dep't of Veterans Affs.*, 26 F.4th 1344, 1347–48 (Fed. Cir. 2022) (holding that the Merit Systems Protection Board's failure to apply the correct legal standard was "legally erroneous"); *Walther v. Sec'y of Health & Hum. Servs.*, 485 F.3d 1146, 1152 (Fed. Cir. 2007) (holding that special master legally erred by appearing to "apply an incorrect legal standard").

Accordingly, we vacate the Claims Court's decision and remand for a determination under the correct legal standard. *See Walther*, 485 F.3d at 1146; *Smith*, 930 F.3d at 1367; *Bryant*, 26 F.4th at 1347–48. Specifically, under the end result test, the Claims Court must "examine[] whether it appears that separate transactions were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result." *Falconwood*, 422 F.3d at 1349 (internal quotation marks and citation omitted); *see also True*, 190 F.3d at 1175.

As part of this examination, the Claims Court must determine the outset of the series of transactions, keeping in mind that the series of transactions should be considered as a whole. *Comm'r v. Clark*, 489 U.S. 726, 738 (1989); *see also True*, 190 F.3d at 1177; *Brown v. United States*, 868 F.2d 859, 862 (6th Cir. 1989). The parties dispute the timeframe for the outset, with GSS advocating for the 2006 and 2007 timeframe when the Aaardvark LAPA and First Loss Note agreement were negotiated and entered, and the government advocating for the 2011 timeframe when the Aaardvark LAPA was renewed[6] and exercised and when the First Loss Note Account payment was made to BNS. *See* Appellant's Br. 33, 44–45; Appellee's Br. 30–31. Once the outset's timeframe has been assessed, the Claims Court must determine the intent from the outset, which is another disputed issue between the parties. *See Falconwood*, 422 F.3d at 1349; Appellant's Br. 46–48; Appellee's Br. 30–37. If the Claims Court does conclude that the separate transactions were "really component parts of a single

---

[6]    In June 2011, Liberty Street and BNS executed a Master LAPA, which included a purchase commitment for the Aaardvark Note. *See* J.A. 1327–69. BNS committed to purchase the Aaardvark Note in an October 2011 purchase commitment agreement with Liberty Street. J.A. 1371–75, 1377–78; *see also* J.A. 178–79.

transaction intended from the outset to be taken for the purpose of reaching the ultimate result," then the step transaction doctrine applies. *See Falconwood*, 422 F.3d at 1349 (citation omitted). The Claims Court should conduct this analysis on remand. We are not suggesting any particular outcome; we are simply instructing the Claims Court to apply the correct legal standard.

Even if the Claims Court applied an erroneous legal standard, the government contends that the intent was the same regardless of the timeframe, and that the Claims Court agreed. *See* Appellee's Br. 37 (first citing *Decision* at 489 ("A payment from the First Loss Note [A]ccount was always anticipated to be at least a partial offset of losses resulting from the sale of a distressed asset."); and then citing *Decision* at 489 n.22 ("The First Loss Note was always intended to absorb the first loss stemming out of a decline in Liberty[] [Street]'s investments.")); *see also* Appellee's Br. 30–34. In other words, the government contends that the same outcome would be reached under the correct legal standard. GSS disagrees, contending that the intent differed at various timeframes. *See* Appellant's Br. 46–48; Appellant's Reply Br. 11–15. Since the Claims Court applied an incorrect legal standard, the Claims Court "should make a new . . . determination under the correct standard in the first instance." *Walther*, 485 F.3d at 1152 (declining to reach the merits of a similar argument). To the extent any finding of the Claims Court "is derived from the application of an improper legal standard to the facts, it cannot be allowed to stand." *Id.* (citations omitted). "In such a circumstance, this court must remand for new factual findings in light of the correct legal standard." *Id.*

GSS contends that under the correct legal standard, the step transaction doctrine would not operate to collapse the individual steps into a single integrated transaction for tax purposes. *See* Appellant's Br. 44–52. In other words, GSS urges this court to reach a determination under the correct legal standard in the first instance. But just as we

will not do so at the government's request, we will not do so at GSS's request.

## IV. CONCLUSION

We have considered the government's remaining arguments and find them unpersuasive. For the above reasons, we vacate the Claims Court's judgment and remand for further proceedings consistent with this opinion.

## VACATED AND REMANDED

### COSTS

No costs.

# United States Court of Appeals for the Federal Circuit

---

**GSS HOLDINGS (LIBERTY) INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2021-2353

---

Appeal from the United States Court of Federal Claims in No. 1:19-cv-00728-EGB, Senior Judge Eric G. Bruggink.

---

NEWMAN, *Circuit Judge*, dissenting.

The United States Court of Federal Claims ("CFC") affirmed a ruling of the Internal Revenue Service ("IRS"), disallowing a tax loss claimed by GSS Holdings (Liberty) Inc. ("Liberty").[1] The loss was disallowed because the transaction was with a related party, and subject to 26 U.S.C. § 707(b). The decision of the CFC was correct in law and as applied to the facts. From the panel majority's ruling that incorrect law was applied, I respectfully dissent.

---

[1]   *GSS Holdings (Liberty) Inc. v. United States*, 154 Fed. Cl. 481 (2021) ("CFC Op.").

## DISCUSSION

It is not disputed that "on December 30, 2011, BNS [Bank of Nova Scotia] and Liberty were related parties for tax purposes." CFC Op. at 489. The IRS disallowed GSS's claimed tax loss deduction, applying 26 U.S.C. § 707(b)(1)(A):

> **[§ 707](b) Certain sales or exchanges of property with respect to controlled partnerships**
>
> > **(1) Losses disallowed.**
> >
> > No deduction shall be allowed in respect of losses from sales or exchanges of property (other than an interest in the partnership), directly or indirectly, between—
> >
> > > **(A)** a partnership and a person owning, directly or indirectly, more than 50 percent of the capital interest, or the profits interest, in such partnership, or
> > >
> > > **(B)** two partnerships in which the same persons own, directly or indirectly, more than 50 percent of the capital interests or profits interests.

The CFC held that the claimed loss was correctly disallowed, explaining:

> Because the First Loss Note payment is properly classed as part of the LAPA [liquidity asset purchase agreement] investment sale, § 707(b)(1) disallows deducting losses on the sale of assets to a related party, and the First Loss Note payment was thus properly disallowed.

CFC Op. at 490.

The transfer of money and assets was conducted through a complex series of steps, as the panel majority recites. Maj. Op. at 2–4. However, the majority holds that the CFC erred in invoking "the larger tax law concept of 'substance over form,'" CFC Op. at 487, and erroneously "applied a hybrid legal standard conflating the step transaction doctrine and the economic substance doctrine," Maj. Op. at 7. However, the CFC well understood and correctly applied the governing law. As stated in *King Enters., Inc. v. United States*, 418 F.2d 511, 516 n.6 (Ct. Cl. 1969):

> [C]ourts have enunciated a variety of doctrines, such as step transaction, business purpose, and substance over form. Although the various doctrines overlap and it is not always clear in a particular case which one is most appropriate, their common premise is that the substantive realities of a transaction determine its tax consequences.

We explained the role of "step transaction" analysis within the "substance over form" analysis of tax effects of transactions:

> The step transaction doctrine is a judicial manifestation of the more general tax law ideal that effect should be given to the substance, rather than the form, of a transaction, "by ignoring for tax purposes, steps of an integrated transaction that separately are without substance."

*Falconwood Corp. v. United States*, 422 F.3d 1339, 1349 (Fed. Cir. 2005) (quoting *Dietzsch v. United States*, 498 F.2d 1344, 1346 (Ct. Cl. 1974)).

The CFC applied this guidance, mindful that "[t]o permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." *Comm'r v. Court Holding Co.*, 324 U.S. 331, 334 (1945). The CFC remarked that "particularly

close scrutiny" should be given when a transaction does "not affect the economic interest of independent third parties," CFC Op. at 488 (quoting *Coltec Indus. v. United States*, 454 F.3d 1340, 1357 (Fed. Cir. 2006)), and that "where parties are interrelated, the court may exercise 'a height[en]ed level of skepticism and scrutiny in th[e] matter,'" CFC Op. at 488 n.21 (quoting *True v. United States*, 190 F.3d 1165, 1173 n.6 (10th Cir. 1999)).

The panel majority faults the CFC for applying "a hybrid legal standard conflating the step transaction doctrine and the economic substance doctrine." Maj. Op. at 7. The CFC indeed applied "the larger family of substance over form cases." CFC Op. at 488. This is not a fault; it is the required procedure of precedent. *See Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978) ("In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed.").

This principle has spawned varied adaptations in various circumstances. *See Penrod v. Comm'r*, 88 T.C. 1415, 1428 (1987) ("The step transaction doctrine is in effect another rule of substance over form; it treats a series of formally separate 'steps' as a single transaction if such steps are in substance integrated, interdependent, and focused toward a particular result.").

The CFC appropriately reviewed the activity concerning transfer of the Aaardvark Note and the related parties, with the objective to "give tax effect to the substance, as opposed to the form of a transaction, by ignoring for tax purposes, steps of an integrated transaction that separately are without substance." *Dietzsch*, 498 F.2d at 1346. Statute and precedent are unequivocally in accord with the CFC's reasoned analysis. There is no basis in law or precedent for the panel majority's rejection of the "substance over form" standard.

I respectfully dissent.